Lang, James F., J.
This is an action by minority shareholders of the defendant limited liability company, Ourway Realty, LLC (“Ourway”), against the company and individuals who are either characterized as majority shareholders or as officers or managers of the company.[1] Ourway owned and operated Plainridge Racecourse (“Plainridge”) in Plainville, Massachusetts, a harness racing enterprise, and in that capacity it sought to be awarded the sole slots facility license under the Commonwealth’s new expanded gaming legislation. The principal thrust of the suit is that, because of illegal distributions to the defendant Gary Piontowski, then the Manager of Ourway, of $1.4 million from Plainridge’s money room, which the defendants Alfred Ross and Stanley Fulton allegedly *489 permitted to occur and then sought to cover up, Plainridge was denied the lucrative slots license by the Massachusetts Gaming Commission, to the substantial financial detriment of the plaintiffs. After the denial, Ourway sold Plainridge to a competing applicant, Penn National Gaming, Inc. (“Penn National”) for $42 million, along with a contingent consideration payment agreement that over a ten-year period will entitle Ourway to 5% of EBITDA up to $40 million and 8% of EBITDA for revenue (minus expenses) above $40 million. To date, all but $2.1 million of the purchase price funds have been paid to Ourway, and they have largely been used to repay loans made by Fulton (and to a lesser extent Ross) to Ourway. The remaining money is being held in escrow by Old Republic National Title Insurance Company pursuant to a Hold-back Escrow Agreement between Ourway and Penn National, and under the terms of that agreement the remainder is scheduled'to be disbursed to Ourway on January 6,2015. The plaintiffs have moved for attachment on trustee process with respect to those funds.[2] After a non-evidentiary hearing on December 11, 2014, and upon consideration of the substantial written submissions of the parties, the motion is ALLOWED.
Rule 4.2 of the Massachusetts Rules of Civil Procedure provides for an attachment on trustee process “only after notice to the defendant and a hearing and upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the trustee process over and above any liability insurance shown by the defendant to be available to satisfy the judgment.” Mass.R.Civ.P. 4.2. The plaintiffs have satisfied that standard with respect to the $2.1 million presently being held in escrow. Based upon the quoted findings of the Gaming Commission, there is substantial support for the plaintiffs’ assertion that the Gaming Commission rejected the IEB’s recommendation of Ourway’s suitability because of nonfeasance and malfeasance by Ross and Fulton in breach of their fiduciary duties. The Gaming Commission faulted them for: the laxity of financial oversight procedures at Ourway; for permitting Piontkowski’s money room withdrawals, even after being advised in an early 2012 audit of the aggregate magnitude of those withdrawals from 2004 to 2010; for allowing Piontkowski to resign without any obligation to repay the funds and with a separation agreement that rewarded him with a $180,000 annual salary for two years after his severance; and for failing to take any steps to investigate Piontkowski’s actions to determine how they were able to occur and who else might have been involved. Unquestionably, it would appear, the denial of the slots license to Ourway was a direct consequence of the Gaming Commission’s negative assessment of the manner in which Ross and Fulton had conducted themselves as principal shareholders.[3] Other materials before the court, including excerpts from the transcript of the adjudicatory hearing before the Gaming Commission, paint a picture of Ross and Fulton’s complicity in or indifference to Piontkowski’s claimed use of money room funds to “take care” of public officials, and they suggest a view of the generous terms of his severance as a form of hush money. The patently false press release that was issued regarding Piontowski’s departure, along with Ross’ similar blatant mischaracterization to the IEB concerning the same bolster the claim that the defendants engaged in actionable misconduct.
In assessing whether the plaintiffs have established a reasonable likelihood of obtaining an amount equal to or greater than the proposed attachment of $2.1 million, the court has given due consideration to the defendants’ arguments. It is inclined on the present record, for example, to agree that the viability of the plaintiffs’ G.L.c. 93A claim is highly questionable given the intra-business nature of the conduct at issue. It recognizes as well that the funds sought to be attached belong to Ourway (although they appear largely bound for disbursement to Fulton), and so it is the meritoriousness of the plaintiffs’ claims against the LLC that is most relevant with respect to the instant motion. But it appears probable that the plaintiffs will be able to establish that together Fulton and Ross functioned as majority shareholders who exercised substantial control over Ourway and that their actions will thus be attributable to the company. Finally, the court acknowledges that the plaintiffs have not rebutted the defendants’ contention that, whether based on revenue likely to be generated from the contingent consideration payment agreement or other assets the defendants possess, there are likely to be sufficient funds to satisfy any potential judgment without resort to the escrowed money. In that regard, the plaintiffs have not made a showing of irreparable harm if their motion for attachment is not allowed. The court does not share the defendants’ view, however, that such a showing is a prerequisite to the requested relief. Unlike Rule 65 (and the legion of cases construing it), which governs preliminary injunctions, Rule 4.2 makes no reference to irreparable harm as an element of that particular form of prejudgment security. The court concludes that the plaintiffs are not obliged to establish such harm. See Clay Corp. v. Colter, 30 Mass. L. Rptr. 536, 2012 WL 6928132, **5-6 (Mass.Super. 2012) (Dupuis, J.) (denying the plaintiffs request for a preliminary injunction based on an analysis of the irreparable harm component of the claim for injunc-tive relief but allowing the plaintiffs motion for attachment on trustee process upon finding a reasonable likelihood that the plaintiff would obtain a substantial judgment).
For the foregoing reasons, the plaintiffs’ motion for attachment on trustee process in the amount of $2.1 million is ALLOWED, and the plaintiffs are authorized *490 to serve a summons upon Old Republic National Title Insurance Company.[4]

Nile plaintiffs’ claims apparently are subject to arbitration, and they have filed a demand for arbitration with the American Arbitration Association. That does not foreclose the granting to them of prejudgment security if they are otherwise entitled.

Nile plaintiffs have requested an attachment in the amount of $4.2 million, the amount of funds that were apparently being held in escrow until a disbursement in August 2014. They have also identified the trustee of the escrow funds as First American Title Insurance Company, apparently incorrectly. In view of the information provided by the defendants as to the actual amount of funds presently being held in escrow and as to the actual trustee of those funds, the court deems the plaintiffs’ motion to be a request for attachment of the $2.1 million that is being held by Old Republic National Title Insurance Company.

Nhe defendants correctly note that neither Ross nor Fulton was a majority shareholder. But the record is sufficient to support an inference that together they acted in concert as one (for example, their co-ownership of Anchors Partners, LLC was but one indicium of the affinity of their interests and actions).

Nhe plaintiffs should amend their complaint to correct the name of the Trustee Process Defendant accordingly.